## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**RAMON MAYSONET-SOLER,**

**Petitioner,**

**v.**

**UNITED STATES OF AMERICA,**

**Respondent.**

**Civil No. 20-1202 (PAD)**
**(Related to Crim. No. 08-310-14 (FAB))**

## OPINION AND ORDER

Delgado-Hernández, District Judge.

Before the court is the Petitioner's "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence" (Docket No. 1). The Petitioner pled guilty under a type C plea agreement;[1] was sentenced in accordance with the terms of the agreement; and seeks to withdraw his plea of guilty and vacate and set aside the sentence, claiming that the sentencing judge unlawfully participated in plea negotiations and his lawyer was ineffective in a number of ways, as discussed below (Docket No. 1). The court conducted 2 hearings- one on April 26, 2023, the other on September 14, 2023 -in which the Petitioner, his change-of-plea counsel and a codefendant testified. See, Minutes of Proceedings, April 26, 2023 (Docket No. 40); Minutes of Proceedings, September 14, 2023 (Docket No. 48). After a thorough evaluation of all issues in light of the record and applicable law, the motion must be denied, and the case dismissed.

---

[1] A type C plea agreement is "an agreement that, if accepted by the court, binds both the parties and the court to act in accordance with its terms." U.S. v. Chambers, 710 F.3d 23, 26 n. 1 (1st Cir. 2013).

## I.     BACKGROUND

### A.  **Original Case**

#### 1.  **Counts/Conviction**

On September 2, 2008, the Petitioner was charged in Counts 1-6 of a 14-count indictment involving 74 defendants (Crim. No. 08-310, Docket No. 4).  Count 1 charged him with conspiracy to possess with intent to distribute 1 kilogram or more of heroin; 50 grams or more of cocaine base; 5 kilograms or more of cocaine; and detectable amounts of marihuana, Oxycodone, and Alprazolam, all within one thousand feet of a public school, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 860.  Id. at pp. 5-19.  Counts 2-5 charged him with aiding and abetting in the possession with intent to distribute 1 kilogram or more of heroin; 50 grams or more of cocaine base; 5 kilograms or more of cocaine; and 100 kilograms or more of marijuana, all within one thousand feet of a public school, in violation of 18 U.S.C. § 2 as well as 21 U.S.C. §§ 841(a)(1) and 860.  Id. at pp. 19-27.  Count 6 charged him with conspiracy to carry and use firearms during and in relation to drug trafficking crimes, in violation of 18 U.S.C. §§ 2 and 1513(e). Id. at pp. 27-29.

On April 20, 2010, after a 3-month jury trial alongside 4 co-defendants (Wilfredo Rosario-Camacho, Luis Rodríguez-Sostre, Josué Pérez-Mercado and José Negrón-Sostre), the Petitioner was found guilty of the drug charges (Counts 1, 2, 3, 4, and 5), and the firearm charge (Count 6) (Crim. No. 08-310, Docket No. 2661).[2]  On August 18, 2010, he was sentenced to life

---

[2] Mr. Rosario-Camacho and Mr. Rodríguez-Sostre were found guilty of both the drug charges and the firearm charge (Crim. No. 08-310-14, Docket No. 2661, p. 2).  Mr. Pérez-Mercado and Mr. Negrón-Sostre were found guilty only of the drug charges.  Id.  The remaining defendants pled guilty prior to trial.

imprisonment as to Counts 1-5 and to 240 months of imprisonment as to Count 6 to be served concurrently with the other counts.  Id., Docket No. 3141.[3]

### 2.  First Appeal

On August 24, 2010, the Petitioner, Mr. Rosario-Camacho, Mr. Rodríguez-Sostre, Mr. Pérez-Mercado and Mr. Negrón-Sostre appealed their conviction and sentence to the First Circuit (id. Docket No. 3160), which on June 25, 2015, concluded that albeit there was sufficient evidence to sustain the convictions, these had to be vacated and the case remanded for a new trial because the District Court (Hon. Francisco A. Besosa) committed "structural error" in closing the courtroom to the public during jury selection.  U.S. v. Negrón-Sostre, 790 F.3d 295, 312 (1st Cir. 2015).  On August 21, 2015, the First Circuit issued the mandate, remanding the case to the District Court (Crim. No. 08-310, Docket No. 4535).

### 3.  Post-Remand Events

#### a.  Conferences

Following remand, Judge Besosa scheduled and held conferences on September 10, 2015 (id. Docket No. 4733); October 13, 2016 (id., Docket No. 4734); November 12, 2015 (id., Docket No. 4735); January 22, 2016 (id., Docket No. 4740); February 11, 2016 (id., Docket No. 4741); and February 17, 2016 (id., Docket No. 4742).

#### i.  September 10, 2015

During the conference of September 10, 2015, Judge Besosa expressed that Attorney Ignacio Fernández (Mr. Rosario-Camacho's attorney), had told the Judge that after the First

---

[3] Mr. Rosario-Camacho and Mr. Rodríguez-Sostre were also sentenced to life imprisonment on the drug charges and 240 months on the firearm charge to run concurrently with the sentence imposed on the drug charges (Crim. No. 08-310-14, Docket Nos. 3136 and 3146).  Mr. Pérez-Mercado was sentenced to life imprisonment on the drug charges. Id., Docket No. 3154.  Mr. Negrón-Sostre was sentenced to 240 months on those charges, to run concurrently with each other.  Id., Docket No. 3151.

Circuit decided the appeal attorney Fernández spoke with various attorneys in the case about the possibility of negotiating some sort of plea. Id., Docket No. 4733, p. 8. Judge Besosa indicated that because there was a possibility of plea agreements and the defendants were imprisoned outside of Puerto Rico, he was thinking about ordering that they be returned to this jurisdiction. Id. at p. 6. The prosecutor said it was preferable to have all of the defendants here and to make an assessment of what their wishes were, because the government would only entertain settlement by way of a plea agreement if all of the defendants decided to plea. Id. at pp. 9-10. Judge Besosa stated that he thought the best way to go forward was to have pleas, for when the case was remanded, the First Circuit went out of its way to mention that the evidence was more than sufficient to convict every one of the defendants. Id. at p. 10. Thus, Judge Besosa asserted that he would order that the defendants be brought back to Puerto Rico as soon as possible; would conduct another status conference in about a month; and hoped that by that time the defendants would be in the jurisdiction and counsel had spoken with and advised them as they saw fit, although he really thought that the way to move forward was by plea. Id. at 10-11.

### ii. October 13, 2015

During the conference of October 13, 2015, Attorney Fernández expressed that he had spoken with Mr. Rosario-Camacho, who informed him that defendants were still stateside because of a hurricane, and that Mr. Rosario-Camacho had talked to the rest of the defendants who were receptive to a reasonable plea agreement. Docket No. 4734, pp. 3, 5. Judge Besosa commented that he hoped the term "reasonable" for the defendants meant the same thing it meant to the government. Id. at pp. 4-5. Attorney Fernández indicated that it was a 2-way street, and that they knew the evidence (id. at p. 6), to which Judge Besosa remarked that so did the First Circuit. Id. Further, Judge Besosa added that during the last hearing the prosecutor

mentioned the government was receptive to a plea, but it would have to be for everyone.  Id. at 4.

The prosecutor pointed out that as soon as the defendants were back in this District, the lead

prosecutor in the case (AUSA Olga Castellón) would meet with the attorneys to discuss

possibilities for a plea agreement.  Id.

### iii. November 12, 2015

During the conference of November 12, 2015, Allison Koury (Mr. Pérez-Mercado's

attorney) expressed that counsel for all of the defendants had met individually with their clients

as well as collectively, and that some of the attorneys had met with AUSA Castellón, who told

them that in order to discuss changes of plea, there must be a change of plea as to all defendants.

Id., Docket No. 4735, pp. 3-4.  According to AUSA Castellón, the government was trying to

fashion a reasonable plea agreement that took into consideration the verdict; the evidence;

possible enhancements; and the First Circuit's opinion.  Id. at p. 5.  Attorney Fernández said that

he had met with the prosecutor; that they had a very meaningful discussion; and that his client

was facilitating the process.  Id. at pp. 6-7.

### iv. January 22, 2016

During the conference of January 22, 2016, AUSA Castellón expressed that the previous

day, the government had tendered plea offers to the 5 defendants.  Id., Docket No. 4740, pp. 4-5.

She indicated that the offers were final, as the government had considered all possible scenarios,

including trial transcripts; the evidence; applicable enhancements; and the First Circuit's

decision.  Id. at p. 5.  Judge Besosa asked if any of the defendants' counsel wished to express

anything.  Id.  Attorney Koury responded that nobody should want to retry this case.  Id. at p. 6.

But, she added, that from the defense's perspective, the case was in pretrial, meaning that they

still had to decide whether to plead guilty or go to trial, and that she was troubled by the disparity

in treatment between the defendants who had pled guilty and those that remained in the case.  Id.

Juan J. Hernández-López de Victoria (the Petitioner's attorney) indicated that the government's

offer should not be a final offer, and he would have to sit down with AUSA Castellón and her

supervisor to discuss the case.  Id. at 7.

Judge Besosa said he understood that the matter had been discussed "all the way to the

top."  Id., Docket No. 4740, p. 7.  Attorney Hernández replied that in the plea negotiation process

attorneys are given the opportunity of sitting down with the supervisor or, if necessary, the U.S.

Attorney, and the defendants' attorneys should have that opportunity as an extra step because no

one wanted to retry the case.  Id. at pp. 7-8.  Judge Besosa remarked that it was up to the U.S.

Attorney to see if he wanted to discuss the case with counsel.  Id. at p. 8.  Further, Judge Besosa

stated that he was going to give the parties some time to discuss this matter with their clients.  Id.

at p. 9.  So, he would set a change of plea hearing/pretrial conference for the week of February

8th, and if by that date motions to change plea had not been filed, he would schedule trial.  Id. at

p. 10.

### v. February 11, 2016

During the conference of February 11, 2016, Judge Besosa expressed that he had granted

a motion from Attorney Fernández on behalf of all defendants requesting until February 12,

2016, to move for change of plea.  Id., Docket No. 4741, p. 3.  The prosecutor indicated that the

First Assistant (Timothy Henwood) had informed defense counsel that if they wished to make a

counterproposal they had until February 11th (that is, the day of the status conference), at 3:00

p.m.  Id. at pp. 3-4.  Attorney Koury noted that the request for continuance was caused solely by

the government's delays, not by the defense.  Id. at 4.  Judge Besosa replied that he did not know

if Mr. Henwood acted in response to Attorney Fernández' motion, but if the attorneys had

already met, they would have some sort of counterproposal that they could provide by 3:00 p.m. Id. at pp. 4-5.  Attorney Hernández commented that the defendants wanted to make a counterproposal, and that it was obvious that none of them, including the government, wanted to try the case again.  Id. at p. 5.  Judge Besosa replied that he got paid whether he tried the case or not.  Id.

Attorney Hernández stated that one of the issues in the negotiations was certainty, and asked Judge Besosa if he would be amenable to a type C plea, to which the Judge answered "No."  Id., Docket No. 4741, pp. 5-6.  Nevertheless, he coincided with counsel in that no one wanted to try the case again and added that one of the things he looked at in a plea agreement is what the plea consists of.  Id. at pp. 5-6.  Along this line, he mentioned that if an agreement is reasonable, depending on the case, he has no problems accepting it.  Id.  The prosecutor indicated she could not make any representation on what Mr. Henwood's position would be on a type C plea.  Id. at p. 6.  Attorney Hernández pointed out that the government had never expressed one way or the other, but he wanted to know if Judge Besosa would be amenable with the numbers, because part of the issues they were dealing with concerned those numbers.  Id.

Judge Besosa inquired if he could ask what the government was offering.  Id., Docket No. 4741, p. 7).  Attorney Fernández replied "sure," and stated that the government was offering a level 38, with a range of from 19 and a half years to 25 years of imprisonment.  Id.  Judge Besosa asked about Attorney Fernández's proposal, to which he responded that defendants would agree to the government's guideline calculations if everyone- including the government - recommended the lower end, that is, 19 and a half years.  Id.  However, he expressed he would be more comfortable going off the record.  Id.  Judge Besosa said "No."  Id.

Attorney Hernández interjected that he had offered a level 35, taking into consideration everything that had happened during the trial.  Id., Docket No. 4741, pp. 7-8.  Judge Besosa observed that there had been a lot of unfavorable evidence against Mr. Hernández' client (i.e. the Petitioner), including firing at people.  Id. at p. 8.  Attorney Hernández replied that he was not trying to go against the evidence and had offered a level 35, but the government rejected the offer.  Id.  He noted that an agreement could be reached between levels 35 and 38, and that certainty would make it easier for counsel to explain, and their clients to understand, that a plea would be proper, because as it stood, it was uncomfortable for them.  Id. at pp. 8-9.  Judge Besosa remarked that what was uncomfortable for the defendants was what the First Circuit had expressed in its Opinion that the evidence against the defendants was overwhelming.  Id. at p. 9. Attorney Koury indicated that she had also submitted a proposal for a level 35, as none of the other codefendants had received anything higher than 15 and a half years.  Id.

Judge Besosa commented that those defendants had not gone to trial, and that he did not think counsel could compare people who did not go to trial to those who did, and it looked likely they were going to trial again.  Id., Docket No. 4741, p. 10.  Further, he expressed that he did not think an offer of 19 and a half to 25 years was that bad.  Id.  Attorney Hernández observed that was why in defense counsels' letter to Mr. Henwood they expressed they were close enough to reach an agreement.  Id.  Judge Besosa remarked that the defendants had been sentenced to life imprisonment, and that he did not think an agreement of 19 and a half to 25 for defendants to argue for the lower end and the government for the higher end was that bad of a deal.  Id.  He said counsel could convince their clients that it was only a 5-year difference, and that they would probably face life imprisonment after another trial.  Id.

Judge Besosa inquired if a type C plea allowing defendants to argue for 19 and a half years, and the government for 25 years would be sufficient.  Id., Docket No. 4741, p. 12.  Attorney Fernández answered that the defendants were not going to take 25.  Id.  Judge Besosa noted that then, they would not be that smart.  Id.  Attorney Fernández commented that he wanted the government to join in a recommendation for 19 and a half years and would like to know the court's feelings on that.  Id. at p. 13.  This, because he and his client were concerned that they could argue for 19 and the government for 25, yet the court ended up imposing 30.  Id.  Judge Besosa mentioned that this was what he had said, in other words, a type C agreement which would allow the defendants to argue for the lower end and the government for the higher end, so it could end up being 25 but not 30.  Id. at pp. 13-14.

At this point, Attorney Hernández asked whether the court would entertain a type C agreement within the guideline range.  Id., Docket No. 4741, p. 14.  Judge Besosa asked if that was what the government was offering.  Id.  Attorney Hernández alluded to adjustments for acceptance of responsibility, to take calculations to a level 37.  Id.  The prosecutor objected that such an arrangement would not be a type C, but Attorney Hernández countered that the court had said it was willing to agree.  Id.  Judge Besosa stated that what he would agree to was a type C plea ranging between 19 and a half to 25 years and that counsel should "hammer it into defendants' heads" that 25 years was better than life imprisonment.  Id. at pp. 14-15.  He queried whether he could set a change of plea hearing for the following week.  Id. at p. 17.  The attorneys went along, and Judge Besosa stated that if motions for change of plea were not filed, he would set a pretrial hearing.  Id. at 18.

Maysonet-Soler v. U.S.
Civil No. 20-1202 (PAD)
Opinion and Order
Page 10

### vi. **February 17, 2016**[4]

During the conference of February 17, 2016, the prosecutor expressed that she had met with Attorney Fernández and the government was open to a type C agreement at level 38 if the court was amenable to the arrangement.  Id., Docket No. 4742, pp. 3-4.  Judge Besosa noted that what the court had indicated was, that although it did not normally accept type C pleas, he was willing to accept a type C plea at level 38 that would allow the defendants to argue for the lower end of the guideline range and the government for the higher end of that range.  Id. at p. 4.  The prosecutor pointed out that the government had proposed allowing the defendants to argue for the lower end of the guideline range and the government for the middle range, which basically adjusted the higher end downwards by approximately 2 years.  Id. at pp. 4-5.  She, however, said that the defendants did not accept the government's offer, and the government was withdrawing the offer and requesting a trial date.  Id. at 5.  As a result, Judge Besosa set trial for March 28, 2016.  Id. at pp. 5-6.

### b.  **Interaction between Petitioner and Attorney Hernández**

Parallel to in-court proceedings, the Petitioner interacted with Attorney Hernández, who had represented him in the first appeal; was familiar with the case; and was appointed to represent the Petitioner after remand (Transcript of Hearing, April 26, 2023, Docket No. 47, pp. 57-59).  He met with the Petitioner, explained to him that in his opinion, trial was not the best option because they had a low probability of prevailing, and recommended they pursue a reasonable plea agreement that would restrict Judge Besosa's ability to go up the guidelines in sentencing the Petitioner after a trial.  Id. at pp. 60-62; 77-78.  So, Attorney Hernández suggested that they pursue a type C plea, to which the Petitioner agreed.  Id. at pp. 60, 63-64.

---

[4] The defendants attended this conference, assisted by a court interpreter (Docket No. 4742, p. 2).

Along this line, Attorney Hernández' voucher reflects correspondence to the Petitioner on status conferences and courses of action on September 10, 2015, and November 12, 2015 (Docket No. 49-1, p. 2); regarding the government's rejection of a plea offer on February 8, 2016 (id., p. 3); and on the government's offer on February 12, 2016. Id. As well, it reflects a meeting with the Petitioner regarding status conference outcome and course of action on November 10, 2015; a meeting to discuss alternatives for disposition of the case on February 11, 2016; and a meeting to discuss the government's latest offer on February 24, 2016. Id. During that last meeting, the Petitioner instructed Attorney Hernández to file a motion for change of plea (id.), which he did, on February 26, 2016. Id., Docket No. 4663.

### c.  **Change of Plea/Sentence**

#### i.  **Petitioner**

On March 1, 2016, pursuant to a type C plea agreement (id., Docket No. 4675), the Petitioner pled guilty to Count 1 of the Indictment, accepting responsibility as a leader of the drug trafficking organization; as owner of the "Osito" brand of cocaine sold by the organization; and for possession with intent to distribute at least 15 kilograms but less than 50 kilograms of cocaine. Id., Docket No. 4868, pp. 6, 24-27. Further, he acknowledged that members of the organization carried firearms to protect themselves, the narcotics, and the proceeds from the narcotics; and would use force and violence to maintain discipline within the organization. Id. Even though the probation officer arrived at a Guideline Imprisonment Range of between 235 and 293 months (id., Docket No. 4743, pp. 20-21),[5] the plea agreement called for a sentence

---

[5] The Probation Officer arrived at a Total Offense Level of 38, which combined with a Criminal History Category of I, led to a Guideline Imprisonment Range of between 235 and 293 months (Crim. No. 08-310, Docket No. 4773, pp. 20-21).

within the lower end and mid-range of the Guideline Imprisonment Range at a Total Offense

Level of 38, corresponding to a sentence of between 235 to 264 months of imprisonment.  Id.,

Docket No. 4675, p. 5.  On July 22, 2016, acting within the parameters set in the plea agreement,

Judge Besosa sentenced the Petitioner to 264 months of imprisonment with a supervised release

term of 10 years.  Id., Docket No. 4869, p. 17; Docket No. 4779, p. 2).  In accordance with the

plea agreement, all the remaining counts against the Petitioner were dismissed (Docket No. 4869,

p. 21; Docket No. 4779, p. 1).

## ii.   **Mr. Rosario-Camacho**

Like the Petitioner, Mr. Rosario-Camacho agreed to plead guilty to Count 1 of the

Indictment under a type C plea agreement, acceding to a sentence at Level 38 of between 235

and 264 months of imprisonment.  Id., Docket No. 4673, p. 5.  On March 1, 2016, he plead guilty

together with the Petitioner.  Id., Docket No. 4868, pp 6, 22-24, 27).[6]  On May 31, 2016,

however, Mr. Rosario-Camacho *pro se* moved to withdraw his guilty plea before he was

sentenced.  Id., Docket No. 4729.[7]  On October 12, 2017, Judge Besosa granted Mr. Rosario-

Camacho's motion.  Id., Docket No. 4965.

Pertinently, Judge Besosa pointed out that: (1) at the change of plea hearing, he had

stated that because this was a type C plea, he would wait for the presentation of the Presentence

---

[6] The Probation Officer identified the range as 235 to 293 months of imprisonment (Crim. No. 08-310, Docket No. 4800, p. 25).

[7] In the *pro se* motion, Mr. Rosario-Camacho argued that he was entitled to withdraw his guilty plea because, in his view, during the trial the government withheld discovery and fabricated evidence; and a package plea offer had coerced him into admitting culpability (Crim. No. 08-310, Docket No. 4729).  In a separate motion, he argued that the record showed a violation of Rule 11(c)(1) of the Federal Rules of Criminal Procedure.  Id., Docket No. 4820. In January 2017, Judge Besosa appointed Assistant Federal Public Defender Judith Mizner to represent Mr. Rosario-Camacho.  Id., Docket No. 4881.  On May 18, 2017, Mr. Rosario-Camacho submitted through counsel a supplemental motion to withdraw his guilty plea.  Id., Docket No. 4911.  The government opposed the motion.  Id., Docket No. 4925.  Mr. Rosario-Camacho replied and filed a supplement to the supplemental motion to withdraw his guilty plea.  Id., Docket Nos. 4928 and 4929.  The government responded (id, Docket No. 4946), and Mr. Rosario replied.  Id., Docket No. 4958.

Investigation Report ("PSR") before accepting the plea; (2) under Fed. R. Crim. P. 11(d)(1) a defendant may withdraw a guilty plea for any reason or no reason at all before the court accepts that type of plea; and (3) the Court had never entered an order accepting Mr. Rosario-Camacho's plea after the Probation Officer filed the PSR.  See, U.S. v. Rosario-Camacho, 282 F.Supp.3d 449, 451-453 (D.P.R. 2017)(laying out reasoning).  As well, Judge Besosa directed the Clerk of the Court to reassign Mr. Rosario-Camacho's case to another district judge.  Id. at 458-459.

On October 13, 2017, the case was assigned to Judge Carmen C. Cerezo.  Id., Docket No. 4966.  Mr. Rosario-Camacho renegotiated the terms of a plea agreement and on July 19, 2018, pled guilty to Count 1 pursuant to a type C agreement allowing him to request 160 months of imprisonment and the government to request 180 months of imprisonment.  Id., Docket No. 5082, pp. 1-2.  On November 2, 2018, he was sentenced to 160 months of imprisonment.  Id., Docket Nos. 5045 and 5091.  The remaining counts were dismissed.  Id.

**d.    Second Appeal**

On July 25, 2016, the Petitioner appealed to the First Circuit (Crim. No. 08-310, Docket No. 4780).  He argued that the waiver of appeal clause in the plea agreement had no effect because the District Court had not taken into consideration his efforts at rehabilitation while imprisoned in connection with the original case (Brief of Defendant-Appellant, U.S. v. Maysonet-Soler, No. 16-2018 (1st Cir. Apr. 4, 2017).  By extension, he claimed that this omission amounted to a miscarriage of justice that warranted reversal of the sentence to a term of 235 months.  Id.  On April 18, 2019, the First Circuit entered judgment dismissing the appeal (Crim. No. 08-310, Docket No. 5151).

On April 22, 2019, the Petitioner moved for rehearing, supplementing the motion on May 10, 2019, with a claim of ineffective assistance of counsel based on Judge Besosa's alleged

participation in plea negotiations.  See, Petition for Panel Rehearing, U.S. v. Maysonet-Soler, No. 16-2018 (1st Cir. Apr. 22, 2019); and, Petition for Panel Rehearing, U.S. v. Maysonet-Soler, No. 16-2018 (1st Cir. May 10, 2019).  The First Circuit denied the request, expressing, among other things, that the denial was "without prejudice to defendant's pursuit of the issue(s) raised via a 28 U.S.C. § 2255 motion filed in the district court."  See, Order of Court, U.S. v. Maysonet-Soler, No. 16-2018 (1st Cir. May 15, 2019).

### B.  **Present Case**

On April 29, 2020, the Petitioner initiated the instant action, seeking to vacate the guilty plea and sentence (Case No. 20-1202, Docket No. 1-1, p. 11).  In this regard, he alleges that: (1) Judge Besosa participated in plea negotiations in violation of Rule 11 of the Federal Rules of Criminal Procedure; (2) the participation was so coercive as to render the guilty plea involuntary; (3) the Judge said that he was going to "hammer" him if he did not pled guilty; and (4) his counsel was ineffective in not telling him that the Judge was not allowed to do that and in not having filed a motion to set aside the plea (Docket No. 1, pp. 4, 5, 7, 8).

## II.    **DISCUSSION**

### A.  **Procedural Default**

Section 2255 authorizes post-conviction relief in 4 situations, specifically, "if the petitioner's sentence (1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." David v. U.S., 134 F.3d 470, 474 (1st Cir. 1998).  The voluntariness of a guilty plea may be questioned on collateral review under § 2255 "only if the plea has been challenged on direct appeal." Pérez-Mercado v. U.S., 2021 WL 666863, *4 (D.P.R. Feb. 19, 2021)(citing Bousley v. U.S., 523 U.S. 614, 621 (1998)(limiting circumstances under which a

guilty plea may be attacked on collateral review)).   A petitioner who fails to challenge the validity of the plea on appeal but later seeks to do so under § 2255 has procedurally defaulted on the claim.  Id.

Still, a procedural default "is not necessarily a total bar to federal habeas relief."  Oakes v. U.S., 400 F.3d 92, 95 (1st Cir. 2005).  Irrespective of a default, a federal habeas petition will be allowed to go forward if the petitioner can show either: (1) that there is a cause for the default and actual prejudice resulting from it; or (2) that he is actually innocent of the offense of conviction.  Id.  This standard presents "a significantly higher hurdle than would exist on direct appeal."  U.S. v. Frady, 456 U.S. 152, 166 (1982).

The Petitioner never challenged the validity of his guilty plea on direct appeal (Docket No. 5151).  Rather, he raised this issue for the first time in a motion for panel rehearing before the First Circuit.  That is not enough to consider it a direct appeal.  See, De-Madrid v. U.S., 2014 WL 12721920, *3 (W.D. Tex. Feb. 14, 2014)(holding that arguments not raised in appellant's initial brief but rather in supplemental briefs were not raised on direct appeal)(citing U.S. v. Pando-De Madrid, 442 Fed.App'x 119, 122 (5th Cir. 2011)).  Moreover, the Petitioner did not claim actual innocence in the petition although in the reply to the government's opposition to habeas relief, his counsel states that the Petitioner "was in fact not guilty" (Case No. 20-1202, Docket No. 28, p. 1).[8]

One office of a Rule 11 hearing "is to test and reaffirm the defendant's commitment to his plea."  U.S. v. Torres-Rosario, 447 F.3d 81, 67 (1st Cir. 2006).  As noted in Posey v. U.S., 2020 WL 2129235 (M.D. Tenn. May 5, 2020), a court conducts a plea colloquy "precisely to

---

[8] Petitioner filed the Petition *pro se* (Docket No. 1).  He expressed that another inmate helped him prepare the document (Docket No. 47, p. 24).

make sure that nothing improper- *including things like a Rule 11 (c)(1) participation violation* -is prompting a defendant to plead guilty; if something inappropriate is influencing the defendant's decision, then the court can ferret it out *before defendant pleads*." Id. at *9.  District courts do this important work whenever they are considering a plea of guilty under Rule 11, but to do it fruitfully, they need the pleading defendant to do his or her part by telling the truth when asked about these things.  Id.  A defendant may not be permitted to hold back purported concerns about alleged improper influences that would be disclosed by a candid answer to the district court's questions inquiring about such matters, only to later raise them when things do not work out at sentencing as the defendant had hoped.  Id.

The Petitioner unambiguously admitted guilt in the signed plea agreement and under oath at the change-of-plea hearing; denied coercion; and has offered nothing but his own word to substantiate the attempt to walk away from those solemn declarations.  See, U.S. v. Gates, 709 F.3d 58, 69-70 (1st Cir. 2013) (concluding that defendant's claim of innocence was not credible when it contradicted his statements in the change-of-plea colloquy and the defendant produced no evidence to prompt the court to reject his prior representations); Posey, 2020 WL 2129235 at *7 (finding no claim of actual innocence based on admissions in plea agreement and at change-of-plea hearing).

The Petitioner never told Attorney Hernández that he was innocent (Docket No. 47, p. 82).  Even more, he admitted responsibility to the probation officer, expressing repentance for his actions (Crim. No. 08-310, Amended Presentence Investigation Report, Docket No. 4743, p. 19).  Thus, the court is not persuaded by the Petitioner's late "stroke of midnight" protestation of innocence.  U.S. v. Adams, 971 F.3d 22, 40 (1st Cir. 2020).  It is simply too weak and implausible to be credible, and by extension, to carry any weight in this process.  See, U.S. v.

Ramos, 810 F.2d 308, 313 (1st Cir. 1987)(noting that the District Court did not abuse its discretion in refusing to give weight to a self-serving unsupported claim of innocence raised judicially for the first time after the Rule 11 hearing)(cited with approval in U.S. v. Fonseca, 49 F.4th 1, 9 (1st Cir. 2022)).[9]  Courts are not obliged "to give weight to a self-serving, unsupported claim of innocence," especially when, as in this case, such a belated claim of innocence flies in the face of several admissions to the contrary.  Adams, 971 F.3d at 40.

Under these circumstances, the Petitioner is left with the need to show cause for the default and actual prejudice resulting from it.  Cause is absent from this case, for the Petitioner knew of Judge Besosa's comments before he pled guilty, and still, opted to go ahead with the plea agreement and change of plea.  Similarly, as this agreement involved a type C deal, it had to be accepted by Judge Besosa, and until it was so accepted, the Petitioner was at liberty to walk away from the agreement just like Mr. Rosario-Camacho had done in May 2016.  Further, the Petitioner was aware of the motions that Mr. Rosario-Camacho had filed (Docket No. 47, pp. 50-51), and even though the Petitioner did not discuss those motions with Mr. Rosario-Camacho (id., p. 52), he chose not to follow Mr. Rosario-Camacho's footsteps.

The interval between the change of plea hearing and the sentencing went by without Judge Besosa formally accepting or rejecting the terms of the plea agreement after review of the

---

[9] See also, U.S. v. Nieves-Meléndez, 58 F.4th 569, 576-577 (1st Cir. 2023)(rejecting defendant's attempt to withdraw guilty plea in part because the innocence claim must be credible and in defendant's case it was not, for it was directly contradicted by plea allocation and plea agreement; the defendant adopted the "Stipulation of Facts" in the agreement, agreed that the facts in the Stipulation were accurate, the Stipulation specified that defendant acknowledged that the possession of the firearms was in furtherance of the drug trafficking crime, and that he possessed with intent to distribute 87.23 grams of marijuana; and the District Court confirmed defendant's understanding of the stipulated facts during the change of plea hearing, with defendant responding "yes" after the court asked him is that what he did); U.S. v. Santiago-Miranda, 654 F.3d 130, 139 (1st Cir. 2011)(similar result where defendant signed plea agreement in which he acknowledged that he was guilty of the conspiracy charged in the indictment; admitted the truth of the "Stipulation of Facts" section of the agreement; and acknowledged under oath at the change of plea hearing that he was guilty).

PSR.  During the intermission, the Petitioner even considered withdrawing the plea, and after discussing the matter with Attorney Hernández, decided not to (Transcript of Hearing ("TR"), September 23, 2023, pp. 29-34, 42-43; Docket No. 49-1, p. 4 (Attorney Voucher No. 4669.0012718, Service Descriptions for July 12, 2016, and July 15, 2016).[10]   The Petitioner made a strategic choice, for by the July 2016 sentencing date he did not know what would happen to Mr. Rosario-Camacho's May 2016 motion, which was eventually granted, more than 1 year later, in September 2017, and only resulted in a new sentence in October 2018, well over 2 years after the Petitioner was sentenced.

The Petitioner alleges that he and his family "consistently attempted" to have his direct appeal counsel (John Mudd, Esq.), to "file the argument" that Judge Besosa had impermissibly participated in plea negotiations but that Mr. Mudd "repeatedly refused to file this argument." See, "Motion to Supplement the Record" before the First Circuit in Case 16-2018, April 22, 2019, p. 1 (Document 00117429577).  However, there is no independent corroboration in the record over what the Petitioner or his family allegedly told Mr. Mudd.  In a similar vein, there is no indication here that the Petitioner complained about Mr. Mudd to the First Circuit or asked that he be removed or replaced by an attorney willing to include the plea negotiations issue on direct appeal.  This, despite the fact that the notice of appeal was filed on July 25, 2016 (Case 08-310, Docket No. 4780), and the corresponding brief on April 4, 2017 (Case 16-2018, Document 00117138167).

---

[10] The September 2023 hearing transcript is a rough transcript of the proceeding.  District Judges have Court Reporters as part of their staff when presiding over the different proceedings held before them. Among other responsibilities listed in 28 U.S.C. § 753, reporters are responsible for promptly transcribing, when requested, the original record of all proceedings held before the judge and prepare and file a certified transcript of the same. The transcript is available, following applicable rules and regulations, to parties who have arranged payment.  And it is also available at the request of a judge, at no charge to the court.  District Judges have access to the rough drafts of the transcripts before a formal request is made by any interested party, or the transcript is filed for the record in the court.  To the court's knowledge, the parties did not request a certified transcript of this hearing.

By April 22, 2019, though, when the Petitioner moved *pro se* for rehearing before the First Circuit, supplementing the motion on May 10, 2019, he knew that Mr. Rosario-Camacho's move had resulted in a better deal, and thus, started raising the argument that the change-of-plea counsel had not provided him with effective assistance of counsel based on Judge Besosa's alleged participation in plea negotiations.  In all, the court is not persuaded that this set of events qualifies as cause to excuse the Petitioner's failure to raise the alleged Rule 11(c)(1) violation on direct appeal.   Excessive delays "sap strength from any proffered reason for withdrawal." Fonseca, 49 F.4th at 9.

### B.   **Judge Besosa's Comments**

For the sake of argument, the court will assume that the Petitioner's allegation of ineffective assistance of counsel may serve as cause to excuse the default.  See, Posey, 2020 WL 2129235 at *7 (construing allegation of ineffective assistance of counsel as ground for excusing procedural default).  But it does not lead where the Petitioner wants to go.  He alleges that the impropriety of Judge Besosa's comments is a done deal, for in his view, that question was adjudicated in Rosario-Camacho, 282 F.Supp.3d at 457-458, and under the law of the case doctrine, once a court decides an issue, the same issue may not be relitigated in subsequent proceedings in the same case (Docket No. 1-1, pp. 6-8; Docket No. 28, pp. 6-8) (citing McMillan v. Rodríguez, 337 F.R.D. 27, 31 n.1 (D.P.R. 2020)).   The government counters that the Petitioner's reliance on Rosario-Camacho, 282 F.Supp.3d at 457-458, is misplaced, as in that case, Judge Besosa allowed Mr. Rosario-Camacho's to withdraw his plea because he so requested before the court had accepted it, not because of the alleged Rule 11(c)(1) violation (Docket No. 14, p. 4).  The government is correct as to why Mr. Rosario-Camacho's motion to withdraw the plea was granted.  But it is also true that Judge Besosa touched on the topic of

whether his comments violated Rule 11(c)(1).  See, Rosario-Camacho, 282 F.Supp.3d at 453-458 (addressing topic).

And so, just what happened in Rosario-Camacho?  At bottom, that Judge Besosa allowed Mr. Rosario-Camacho to withdraw his plea of guilty.  See, 282 F.Supp.3d at 458.  In the process, Judge Besosa mentioned that the comments he had made were analogous to those made by the judge in U.S. v. Bruce, 976 F.2d 552, 555, 558 (9th Cir. 1992), where the judge implored defendants to "think carefully" about the fact that they faced life sentences if convicted at trial. See, Rosario-Camacho, 282 F.Supp.3d at 457 (quoting Bruce, 976 F.3d at 558).  In addition, Judge Besosa noted that the fact plea negotiations were ongoing at the time he made the comments bolstered Mr. Rosario-Camacho's argument that there was a possible Rule 11(c)(1) violation.  Id.  Still, Judge Besosa did not find that the comments violated the Rule.  Id. at 458 ("[T]he Court need not rule on whether it participated in plea negotiations contrary to Fed.R.Crim.P. 11").  Instead, he found that Mr. Rosario-Camacho's objection was non-frivolous and may have merit on appeal.  Id.  At that juncture, Judge Besosa ordered the Clerk of the Court to reassign the case to a different judge, "for the sake of allowing both parties an opportunity to pursue a disposition free from any potential Rule 11 challenge."  Id. at 458-459.

Where does this lead to?  Rule 11(c)(1) provides that "[a]n attorney for the government and the defendant's attorney . . . may discuss and reach a plea agreement," but "[t]he court must not participate in these discussions." Fed.R.Crim.P. 11(c)(1).  The ban on judicial involvement in the plea-bargaining process "furthers three goals."  U.S. v. Bierd, 217 F.3d 15, 19 (1st Cir. 2000).  First, judicial involvement in plea negotiations inevitably carries with it the high and unacceptable risk of coercing a defendant to accept the proposed agreement and plead guilty.  Id. Second, the interests of justice are best served if the judge remains aloof from all discussions

preliminary to the determination of guilt or innocence so that his impartiality and objectivity shall not be open to any question or suspicion when it becomes his duty to impose sentence.  Id. Third, the prohibition preserves the judge's impartiality after the negotiations are completed, for example when assessing the voluntariness of a plea or presiding over trial when a negotiation fails.  Id.[11]

The line between a judge discussing a case with the parties and impermissibly participating in plea negotiations "can be a fine one."  1A Fed. Prac. & Proc. Crim. § 181, p. 3 (5th ed.).  For example, a "single brief" comment during negotiations does not cross the line. U.S. v. González-Colón, 582 F.3d 124, 130 (1st Cir. 2009).  Likewise, "off-the-cuff" remarks about a possible sentence do not constitute judicial participation.  Bierd, 217 F.3d at 20-21. However, the court crosses the line when it threatens a defendant with a higher sentence if he pursues his right to a trial instead of pleading guilty.  Id. at 20.  To this effect, see, U.S. v. Cano-Varela, 497 F.3d 1122, 1133 (10th Cir. 2007)(court crossed into forbidden territory when it informed the defendant that he would "be doing at least ten years in a federal penitentiary if he did not plead and was found guilty at trial and that a post-trial sentence will be a harsh one")(internal citations omitted); U.S. v. Crowell, 60 F.3d 199, 204 (5th Cir. 1995)(sentence vacated where court indicated, while the parties were negotiating a second agreement, that a penalty more severe than in the initial rejected agreement was necessary); U.S. v. Anderson, 993 F.2d 1435, 1439 (9th Cir. 1993)(plea vacated due to court's refusal to accept a plea to fewer than 30 counts and directing the prosecutor not to offer a different deal in the future); U.S. v. Miles,

---

[11] To the same effect, see, U.S. v. Pagán-Ortega, 372 F.3d 22, 27 (1st Cir. 2004)(observing that arguments against judicial intervention in plea negotiations include that words of wisdom from a judge are all too likely to be coercive; the judge's impartiality may be diminished; and the judge's role may appear to be that of an advocate rather than that of a neutral).

10 F.3d 1135, 1138-1140 (5th Cir. 1993)(vacating guilty pleas where judge stated that he would be more comfortable if the defendants were never released from jail and essentially crafted a more stringent plea agreement than that proposed); U.S. v. Barrett, 982 F.2d 193, 194-196 (6th Cir. 1992)(conviction set aside where judge stated that "there is no way on God's green Earth I am going to sentence [defendant] to only [7] years, and I think the likelihood is I am going to exceed the guidelines"); Bruce, 976 F.2d at 555 (vacating defendant's conviction where judge repeatedly urged defendants to "think carefully" about the fact that they faced life sentences upon conviction after trial; reminded them that the penalty under the sentencing guidelines would  be "so heavy," "so very, very heavy;" and requested that the prosecution leave the offer open to allow the defendants more time to consider pleading guilty).

Placing Judge Besosa's comments in context, the first comment[12] did not implicate any of the concerns regarding prohibition of judicial participation in plea negotiations, for he was participating in a general discussion about the status and desirability of plea negotiations during the first status conference after the First Circuit vacated the sentence and remanded the case.  In fact, it encompassed a proposition with which all of the defendants agreed.  The comment is similar to those made in U.S. v. Uribe-Londoño, 409 F.3d 1 (1st Cir. 2005), where the First Circuit found no Rule 11(c)(1) violation when the judge stated his desire to reach a plea agreement and inquired about the status of the plea negotiations.  Id. at 4.

---

[12] "But I really think that the way to move forward here is, is a plea" (Crim. No. 08-310, Docket No. 4733, p. 11).

Maysonet-Soler v. U.S.
Civil No. 20-1202 (PAD)
Opinion and Order
Page 23

Likewise, the second third, and fourth comments[13] dealt with a factual and compelling comparison with the risk of conviction following trial, nor unlike those made in Pagán-Ortega, 372 F.3d at 22, where the First Circuit found that the comments of "super break" and "good deal" did not violate Rule 11(c)(1) because they were related to a factual comparison with the risk of conviction following trial.  Id. at 28.  From that angle, tracking the U.S. Sentencing Guidelines, if found guilty the Petitioner was exposed to life in prison.  Id., Docket No. 2872 (Presentence Investigation Report), p. 31.  Judge Besosa knew this, for he had presided over the Original Case and sentenced the Petitioner accordingly.  And so did the Petitioner (Docket No. 47, p. 25).  It would be "folly for a judge to close his eyes to case-related matters within his personal knowledge." U.S. v. Caramadre, 807 F.3d 359, 374 (1st Cir. 2015).

Still, Judge Besosa made the comments before the parties had presented to him a final plea agreement for his review and feedback, rather than an outline of its basic contours.  Along this line, see, Crowell, 60 F.3d at 204 (noting that while the district court is expected to take an active role in evaluating a plea agreement once it is disclosed, it crosses over the line established by Rule 11(c)(1) and becomes involved in plea negotiations when it discusses with counsel before the agreement is in final form, the range of punishment that would be required for the agreement to be acceptable).[14]  So, without placing the comments on either side of the line, what if they infringed Rule 11(c)(1)?  The Petitioner posits that any such violation requires *vacatur* of the conviction and sentence (Docket No. 28, p. 8).  But that is not necessarily so.

---

[13] "I think there was a lot of bad evidence against your client" (Crim. No. 08-310, Docket No. 4741, p. 8), "You have to remember, your clients were sentenced to life imprisonment" id. at p. 10, and "You've got to hammer it into their heads, 25 years is better than life imprisonment." Id. at p. 15.

[14] See also, Pagán-Ortega, 372 F.3d at 27, where the District Court was led to believe that "an agreement had been reached."

Maysonet-Soler v. U.S.
Civil No. 20-1202 (PAD)
Opinion and Order
Page 24

### C. **Harmless/Plain Error**

Rule 11(h) provides that "[a] variance from the requirements of th[e] rule is harmless error if it does not affect substantial rights." Fed.R.Crim.P. 11(h). Similarly, Rule 52(a) prescribes that "[a]ny error … that does not affect substantial rights must be disregarded." Fed.R.Crim.P. 52(a). And Rule 52(b) states that "[a] plain error that affects substantial rights may be considered even though it was not brought to the [trial]court's attention." Fed.R.Crim.P. 52(b). In U.S. v. Dávila, 569 U.S. 597 (2013), the Supreme Court took these parameters into account to reject the notion that deviations from Rule 11(c)(1)'s ban on judicial involvement in plea negotiations "demands automatic vacatur of the plea without regard to case-specific circumstances." Id. at 609. It noted that Rule 11(c)(1) was adopted as a prophylactic measure, not one impelled by the Due Process Clause or any other constitutional requirement. Id. at 610. And it laid to rest the belief that Rule 11(c)(1) errors are structural. Id. at 611.[15] For the Court, those errors do not undermine the fairness of a criminal proceeding as a whole. Id.

On that basis, a defendant who seeks reversal of his conviction after a guilty plea on the ground that the District Court committed plain error under Rule 11(c)(1) must show a reasonable probability that, but for the error, he would not have entered the plea. Id. at 608.[16] To make this determination, the court must evaluate the comments in question not in isolation, but in light of the full record. Id. at 612. Hence, it may consider events that "precede and postdate" the Rule

---

[15] As Judge Wilkinson noted concurring in U.S. v. Sanya, 774 F.3d 812 (4th Cir. 2014), a holding of structural error "would have vitiated the Supreme Court's long support for the finality of guilty pleas." Id. at 822 (quoting Dávila, 569 U.S. at 608).

[16] It bears noting that the Supreme Court did not adopt a "reasonable possibility" test, which "would have proven much easier for defendants to satisfy but would also have undermined plea finality." Sanya, 774 F.3d at 823 (Wilkinson, J. concurring).

11(c)(1) error.   U.S. v. Castro, 736 F.3d 1308, 1313 (11th Cir. 2013).   Viewed through this prism, the Petitioner cannot prevail.

First, the Petitioner had been found guilty in a jury trial and sentenced to life imprisonment.   Because of a structural error not linked to the merits of the prosecution, the First Circuit vacated the sentence and remanded to a new trial after concluding that the evidence was sufficient to sustain the conviction.   The Petitioner was aware of the evidence against him because he attended the trial.   Based on the Sentencing Guidelines, if found guilty, he was exposed to life in prison, as he had been sentenced to in the original case.   See, Crim. No. 08-310, Presentence Investigation Report (Docket No. 2872), p. 31.

Second, Attorney Hernández estimated the Petitioner's probability of success at between 5% and 20% (Docket No. 47, pp. 78-79).   In ordering a new trial, the First Circuit remanded the case to Judge Besosa, who had presided over the trial and was familiar with the evidence.   The Petitioner knew this.   Against this backdrop, Attorney Hernández reviewed options with the Petitioner, who instructed him to negotiate a plea agreement, for the Petitioner did not wish to go to trial and risk a conviction and a life sentence as had occurred in the Original Case.   Id. at pp. 59-64, 66.   It was in the Petitioner's interest to negotiate a plea deal with the government, and more to the point, as counsel explained during the hearings conducted in the present case, a type C agreement that would limit Judge Besosa's discretion in imposing sentence (Docket No. 47; p. 62; TR, p. 19).

Third, after the Petitioner decided to plead guilty, he signed a plea agreement acknowledging the facts underlying the Count he would be pleading guilty to (Count 1), and his participation in the offense (Crim. No. 08-310, Docket No. 4675).   The Petitioner certified that his counsel had translated the plea agreement into the Spanish language; that the Petitioner had

no doubts as to the contents of the agreement; that he fully understood the agreement; and that he voluntarily agreed to it.  Id. at 9.  In the same way, under oath during the change-of-plea hearing, he agreed with the summary of the facts the government proffered on the record during the hearing, including his role as leader and drug point owner for the drug trafficking organization; his ownership of the "Osito" brand of cocaine sold at the drug point; the amount of drugs; the organization's members' use of firearms to protect themselves, the narcotics and the narcotic proceeds; the use of force and violence to maintain discipline within the organization; and the enhancements he was subjecting himself to.  Id., Docket No. 4868, pp. 24-26.  Additionally, referring to the proffer, he stated that this was what he had done and that he wanted to plead guilty.  Id. at p. 26.

Further, the Petitioner admitted that he understood he had the right to maintain the plea of not guilty if he wanted to, and that if he were to maintain a plea of not guilty, he would have the right to a trial by jury.  Id. at p. 8.  Even more, he acknowledged that no one had attempted to force him to sign the plea agreement (id., p. 17) and that he was pleading guilty of his own free will because he was in fact guilty.  Id. at pp. 17-18.  See, U.S. v. Paul, 634 F.3d 668, 674 (2d Cir. 2011)(rejecting attempt to withdraw plea of guilty in part because at change of plea hearing, when the District Court asked defendant whether he was "making the plea voluntarily and of [his]own free will, he answered "[y]es" and when the court asked whether "anyone threatened or forced [him] to plead guilty," defendant answered "[n]o").[17]

---

[17] In a similar vein, the Petitioner never told his attorney that he felt threatened, and the attorney does not believe that the Petitioner felt threatened (Docket No. 47, p. 68).  The attorney credibly explained during the April 2023 hearing that if he had believed otherwise, he would have stopped the change of plea hearing.  Id. at 70.

Maysonet-Soler v. U.S.
Civil No. 20-1202 (PAD)
Opinion and Order
Page 27

Fourth, the Petitioner pled guilty on March 1, 2016, 19 days after the last of the statements he takes aim at, made on February 11, 2016.  In this sense, the situation resembles that in Posey, 2020 WL 2129235 at *9, where the court rejected an attempt to withdraw a guilty plea made 18 days after the alleged Rule 11 violation.[18]  As the Posey court observed, with almost 3 weeks in the interim, there was no reason to think that the plea of guilty was some "knee-jerk" reaction to the district judge's comments, made reflectively out of fear.  Id.  To that end, compare Ramos, 810 F.2d 308, 313 (1st Cir. 1987)("Acevedo's 'change of heart' came . . . [13] days after his guilty plea . . . Acevedo does not persuade us, as it did not the district court, that his 'change of heart' was dictated by anything but to gain personal advantage") and Nuñez Cordero v. U.S., 533 F.2d 723, 725 (1st Cir. 1976)(motion to withdraw change of plea denied for 2-week delay in filing) with, Bruce, 976 F.2d at 554 (allowing defendant to withdraw plea in case where he pled guilty 1 day after Rule 11(c)(1) violation); Anderson, 993 F.2d at 1437 (pleading guilty 2 days after violation); Sanya, 774 F.3d at 817-818 (5 days); Barret, 982 F.2d at 194 (6 days).  Even more, after pleading guilty on March 1, 2016, the Petitioner did not raise any Rule 11 issues with the court.  And before sentencing on July 22, 2016, he even considered withdrawing from the plea, as he could have done, for this was a type C agreement and Judge

---

[18] In Posey, the District Court inquired about the timing of the government's last offer, indicated her interest in making plea negotiations more fruitful, encouraged the defendant's counsel to make a counteroffer, noted that defendant's refusal to approve any of the counteroffers his counsel had formulated was "short-sighted," encouraged defendant's counsel to continue to speak to the defendant "given his possible exposure in this case," referred to the maximum prison term for the various counts in the Indictment, opined that the defendant was facing "a lot of time," and the prospect of numerous witnesses against him at trial, and expressed confidence that the defendant's counsel had already been "very realistic" with the defendant about his exposure to being convicted for something out of all the counts.  See, 2020 WL 2129235 at * 2.

Besosa had not yet accepted the plea (TR, pp. 29-34, 42-43; Docket No. 49-1, p. 4).  But the

Petitioner decided not to.[19]

Fifth, the plea agreement that the Petitioner ultimately accepted not only protected him

from life imprisonment but lowered the potential guideline exposure at the agreed upon level by

29 months.  And this was not what the government originally proposed, as it had proposed an

open agreement, which would have allowed the sentencing judge to impose an upward variant

sentence (TR., p. 25).  Instead, the Petitioner benefitted from a type C agreement.  Compare this

scenario with that in Sanya, 774 F.3d at 812, where the court allowed defendant to withdraw

guilty plea on account of Rule 11(c)(1) violation in part because the plea agreement afforded

defendant little in the way of benefits or concessions from the government, which suggested that

it was the district court's repeated exhortations as to why it would be advantageous for the

defendant to plea rather than the plea itself that changed the defendant's mind and led him to

plead guilty.  Id. at 817-818, 820.

Sixth, all this culminated a plea negotiation process lasting at least 3 and a half months

(e.g. from November 12, 2015 to March 1, 2016), where the Petitioner not only participated in

codefendant meetings (Docket No. 47, p. 46) but discussed the government's offers with his

attorney, both of which are highly relevant elements in determining whether the guilty plea was

knowing and voluntary (Crim. No. 08-310, Docket No. 46-1, pp. 2-3).  See, Adams, 971 F.3d at

22 (acknowledging the importance of these elements in the "knowing/voluntariness" calculus).

So, in all, the court is not persuaded that the Petitioner would not have pled guilty in the absence

---

[19] Aggregating the period running between the last of the allegedly offending comments and the sentencing date in this type C setting means that approximately 5 and a half months went by without the Petitioner moving to withdraw the plea of guilty, a period far surpassing the 13 and 14 day delays that, as discussed above, the First Circuit found unacceptable in Ramos, 810 F.2d at 313 and in Nuñez Cordero 533 F.2d at 725.

of the statements that he complains about.  He was not interested in going to trial but in a plea agreement that constrained Judge Besosa discretion to sentence him to a sentence of imprisonment of between 235 months (19 and a half years) and 264 months (22 years).  The Petitioner's counsel advocated for the lower end of that range, which the Petitioner did not object to (Crim. No. 08-310, Docket No. 4869, pp. 12-13).  Ultimately, Judge Besosa imposed the higher end of the terms set in the plea agreement.  Id. at p. 17.  Nevertheless, the Petitioner avoided the potential life imprisonment he would have been exposed to had he been found guilty as occurred in the Original Case.  And Judge Besosa dismissed the remaining charges as called for in the plea agreement.  Id. at p. 21.

The Petitioner had compelling reasons to make a deal and reduce his sentencing exposure, as in effect happened.  The fact that he found himself "faced with a stiffer sentence than he had anticipated" does not justify abandoning a guilty plea.  Moreno-Espada v. U.S., 666 F.3d 60, 67 (1st Cir. 2012).  Buyer's remorse "is not a valid basis on which to dissolve a plea agreement."  Id.  A guilty plea will not be set aside where a defendant has had a change of heart simply because he now believes the case against him has become weaker or because he is not satisfied with the sentence he has received.  Id.

A similar situation occurred in Pérez-Mercado, 2021 WL 666863, where a sister court in this District rejected a § 2255 petition by one of the codefendants in the Petitioner's underlying criminal case, who had been sentenced to 265 months of imprisonment pursuant to a type C plea agreement, and who like the Petitioner, attempted to withdraw his guilty plea because of Judge Besosa's comments.  Id. at *4.  The sister court observed that the government's case was "remarkably strong;" the defendant had been convicted after trial and sentenced to life imprisonment prior to the case being remanded for new trial on grounds unrelated to the

sufficiency of the evidence; and the First Circuit had concluded that there was sufficient evidence to sustain the defendant's convictions.  Id.  Bearing in mind the defendant's exposure to life imprisonment, the sister court described the plea deal as extraordinarily favorable to him.  Id.  For the same reason, the sister court found that the defendant's claim that he would have rejected such exceptionally favorable terms strained credulity.  Id.[20]  So too here.  See, U.S. v. Borrero-Acevedo, 533 F.3d 11, 15, 17-18 (1st Cir. 2008)(rejecting on plain error review, defendant's attempt to invalidate the waiver-of-appeal clause in a plea agreement on account of the magistrate judge's failure to comply with requirements of Fed. R. Crim. P. 11(b)(1)(N) in part because the government had a strong case; defendant had compelling reasons to make a deal and reduce his sentencing exposure; and he received the exact sentence recommended by the plea agreement).[21]

This configuration fits procedural settings where defendants have unsuccessfully attempted to withdraw pleas following Rule 11(c)(1) violations.  Take Dávila, 569 U.S. at 601, where the defendant, dissatisfied with his court-appointed attorney, sent a letter to the district court requesting that a new attorney be appointed to represent him.  Id.  According to the defendant, his lawyer advised him to plead guilty, offering "no defensive strategy."  Id.  The request for new counsel was referred to a magistrate judge who held an *in camera* hearing at which the defendant and his attorney, but no representative of the government, appeared.  During the hearing, the magistrate made a number of inappropriate comments urging defendant to plead

---

[20]  See also, U.S. v. Oakes, 411 F.Supp.2d 1, 4 (D. Me. 2006)("Often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted")(citing Brady v. U.S., 397 U.S. 742, 756 (1970)).

[21]  See also, U.S. v. Myers, 804 F.3d 1246, 1257-1258 (9th Cir. 2015)(defendant did not show reasonable probability that he would not have pled guilty in the absence of Rule 11(c) (1) error, as he: (1) actively sought to reach a plea deal with the government; (2) reached a favorable deal; (3) avoided trial; and (4) received a below-Guidelines sentence).

guilty and cooperate with the government.  For example, the magistrate judge instructed defendant that it might be a good idea to accept responsibility and plead guilty because the government "has all of the marbles in this situation and they can file that . . . motion for [a] downward departure . . . if they want to."  Id. at 602.  Further, the magistrate informed defendant that his guideline sentencing range would probably be "pretty bad" because his "criminal history score would be so high."  Id.  Tying these elements together, the magistrate suggested that defendant could reduce his sentencing exposure by cooperating with the government "in this or in other cases," stating "You've got to go [to the cross] and you've got to tell it all Brother. . . ."  Id. at 603.

As to the defendant's complaint that his attorney had advised him to plead guilty, the magistrate told defendant that in view of whatever the government's evidence in a case might be, "it might be a good idea for the [d]efendant to accept responsibility for his criminal conduct[,] to plead guilty[,] and go to sentencing with the best arguments . . . still available [without] wasting the Court's time, [and] causing the [g]overnment to have to spend a bunch of money empaneling a jury to try an open and shut case.  Id. at 601.  The defendant pled guilty three months later.  Id. at 603-604, 611.  The Eleventh Circuit vacated defendant's guilty plea consistent with the Circuit's then-existing rule requiring automatic vacatur for Rule 11(c)(1) violations.  Id. at 604-605.  The Supreme Court, however, reversed, pointing out that the Court of Appeals should have considered whether it was reasonably probable that, but for the magistrate's exhortations, defendant would have exercised his right to go to trial, a question to be answered in light of the full record.  Id. at 612.

Despite the "highly improper" character of the magistrate's comments, on remand, the Eleventh Circuit was not convinced that it was "reasonably probable" that the result would have

been different but for the magistrate's error.  U.S. v. Davila, 749 F.3d 982, 994-996, 998-999 (11th Cir. 2014).  The Eleventh Circuit noted that the defendant swore under oath during his change-of-plea hearing that his plea was not coerced and acknowledged that the government could prove the conduct underlying the offense; he pled guilty 3 months after the Rule 11 violation occurred, not close on its heels; and the final plea agreement was significantly more favorable than the agreement the government initially offered him.  Id. at 996.[22]  Moving forward, the Eleventh Circuit considered 2 additional elements.  First, that in seeking to withdraw the guilty plea, the defendant did not mention the improper comments, instead offering different reasons for doing so.  Second, that the Judge who approved the plea agreement and conducted the plea colloquy was not the judge who committed the violation.  Id.

As to the first element, the Petitioner's deliberate strategic delay in raising the Rule 11(c)(1) issue described earlier is no less serious than merely omitting reference to improper comments in moving to withdraw a guilty plea.  As to the second element, it may provide some degree of support for the Petitioner's position but is not dispositive.  See, Castro, 736 F.3d at 1309-1312 (rejecting the defendant's attempt to withdraw guilty plea following a Rule 11 violation even though the Judge who made the improper comment presided over the change of plea hearing).  At the end of the day, it is not enough to prevail in light of the full record.

A similar analysis led the court in Castro, 736 F.3d 1308, to reject a defendant's request to withdraw a guilty plea.  In that case, the defendant verified in the plea agreement and during the plea colloquy that no one had forced him to plead guilty; acknowledged that the government

---

[22] Analogous elements are present in the instant case.  As noted above, the Petitioner pled guilty 19 days after the date of the last comment.  As this took place in a type C agreement setting where the Judge did not expressly accept or reject the agreement, the Petitioner had until the day of the sentence to withdraw his plea.  The sentence took place approximately 5 and a half months after that comment.  During this time, the Petitioner considered withdrawing the plea but opted not to.

could prove the facts of his conduct; by pleading guilty, he avoided prosecution and punishment for 7 offenses, including a second charge of carrying a firearm during a trafficking offense for which he faced a mandatory sentence of 25 years of imprisonment that had to run consecutively to his other sentences; in moving to withdraw the plea did not mention the court's improper comment; his conduct in the District Court smacked of gamesmanship, suggesting that he decided to plead guilty because he did not want to forego a favorable plea agreement; and after unsuccessfully moving to withdraw his plea over the fact that he was displeased with the sentence he received, he sought reconsideration on the grounds that he had been denied his right to counsel and succumbed to the pressure exerted by defense counsel to plead guilty.  See, Id. at 1314-1315 (describing factual background).  Also, as noted earlier, the defendant pled guilty before the same Judge who made the Rule 11(c)(1) related comment.  And the comment was made after the defendant told the Judge in the change-of-plea hearing that he did not wish to plead guilty.  Id. at 1310-1311.  Following the judge's comment, however, the defendant pled guilty.  Id.  The Court of Appeals held that the record did not establish that, but for the Judge's comment, the defendant would have exercised his right to trial.  Id. at 1309.  Comparing the record here with that of Castro leads to the same conclusion.

The same line is found in U.S. v. Nesgoda, 559 F.3d 867 (8th Cir. 2009), where the Court of Appeals rejected an attempt to vacate a guilty plea, noting that the defendant had initiated contact with the District Court, expressing a desire to plead guilty under the impression that he faced a life sentence if he went to trial.  Id. at 869-870.  In the pretrial hearing, the government indicated that there was a plea offer which contemplated a sentencing range of 262 to 327 months.  Id. at 870.  The defendant expressed dissatisfaction with the number, pointing out that it was not much different from a life sentence.  Id.  The Judge responded telling the defendant that

262 months was not life: that he was still a young man: that he had plenty of time after he got out of prison to do all kinds of things: and that after 18 years, he would be out and the Judge would still be alive and out to supervise him.  Id. at 868.  The defendant argued that the Judge's remarks were unnecessarily coercive, making it difficult for him to refuse to plead guilty.  Id. at 870.

The Court noted that (like the Petitioner) the defendant had not raised the matter at the plea hearing; and that the comments about the length of the sentence were in direct response to the defendant's comments and were not coercive.  Id.  at 869-870.  According to the Court, they did not promise, suggest, or threat any particular sentence based on the defendant's decision to plead or not.  Id.  at 870.  In the Court's view, while there may or may not have been a technical Rule 11(c)(1) violation, it was not a violation that satisfied the plain error rule.  Id.  As the Court stated, "[c]onsidering that [the defendant] initiated contact with the district court, expressed a desire to plead guilty, and was under the impression that he faced a life sentence if he went to trial, there is no reasonable probability that [he] would have proceeded to trial absent the alleged participation by the district court during the pretrial hearing."  Id.  That description could have come from the present case.[23]  The situation here is far off from those found in cases where courts have authorized plea withdrawals.

Consider U.S. v. Baker, 489 F.3d 366, 368 (D.C. Cir. 2007).  In Baker, at the close of a pre-trial hearing the District Court initiated and engaged in a lengthy discussion with the defendant, referring to the "year and a day" sentence it had imposed in a similar case; emphasizing "at least four times" that the Court would be "consistent" to the extent it could; mentioned that the previous defendant had pled guilty "early on;" and twice encouraged the

---

[23] Judge Besosa's comments were part of his response to attorney Hernández' request for feedback on the feasibility of a type C agreement.

parties to "talk again" and see if they could resolve the case.  Id. at 374.  During the hearing, the government reiterated its offer of 21 to 37 months.  Id.  Yet, first thing the next morning, the defendant informed the Court of his desire to plead to the indictment with no agreement with the government, something "illogical," considering that the indictment carried a 41-month guideline maximum and the defendant had a 21-to-27 month offer on the table.  Id.

It goes without saying that it was illogical, unless the defendant thought that the court would give him a better deal if he plead guilty early on.  Id. at 374.  However, the District Court sentenced the defendant to 41 months of imprisonment for the federal offenses and additional 10 months for his related District of Columbia Code offense.  Id. at 370.  During the sentencing hearing, the defendant stated: "When I came here on March 2 (sic) and fell on my sword, I was pretty much thinking in relation to a case that you had referenced prior to my making my guilty plea of an individual who, I think you said he took a hundred and some odd thousand dollars and you gave him like a year and a day."  Id. at 374.  The Court of Appeals pointed out that the defendant had forgone the government's offer because he perceived the District Court had tacitly made him a better one with court-initiated, lengthy, repetitive remarks.  Id. at 375.  That did not happen in the present case.

A similar situation occurred in U.S. v. Bradley, 455 F.3d 453, 456-459, 462 (4th Cir. 2006), in which the District Court initiated plea discussions during the jury trial; advised the defendants directly that they might be better off pleading to the indictment; suggested that they would receive life sentences if they went to trial; commented on the amount and weight of the government's evidence as it was being presented; criticized the defendants for turning down plea offers from the government; urged the defendants to attempt to dispose of the charges against them on a reasonable basis; and explained to the defendants that even if the prosecution would

not recommend the sentence that the defendants desired, this should not prevent a plea agreement because the Court, not the prosecution, would determine the sentence.[24]

When the government refused to agree to terms of their liking, the 3 defendants were content to take their chances at trial.  One of them refused to consider a plea agreement that would have required him to cooperate with the government; on 2 occasions, another defendant refused to go forward with a guilty plea during the Rule 11 colloquy, and even after 2 weeks of trial and countless warnings from the court, the third defendant was not willing to enter a guilty plea unless the government agreed to dismiss one of the counts against him.  The Court of Appeals concluded that there was a reasonable probability that the defendants would not have pleaded guilty in the midst of trial without the District Court criticizing their decision to reject plea offers from the government; repeatedly questioning their reasons for proceeding with the trial; and advising them to plead to the indictment.  Id. at 463-464.

As discussed at length above, that is not what happened in the case at bar.  On the record here, as in Posey, 2020 WL 2129235, "there is no reason to believe that, contrary to what [the] Petitioner said in his plea agreement and plea hearing- confirming the voluntary, unpressured, fully advised and fully counseled nature of his plea of guilty -a reasonable probability exists that he actually would not have plead guilty but for the district judge's alleged [Rule 11(c)(1)] participation violation."  Id. at * 9.

---

[24] Among other things, at the end of one of the trial days, the District Court expressed sadness that the defendants had not taken advantage of the "very, very favorable … extraordinarily favorable," plea offers that had been made, and stated, the reason "we are so taken by this case is because this would appear-nobody can predict what his jury is going to do, nobody can ever predict what a jury is going to do, but from all appearances, this is one of the strongest cases ever to  be brought in this courthouse."  Bradley, 455 F.3d at 458.  At one point, one of the defendants told the court, "You keep telling us to cop out, like we are already guilty."  Id. at 459.

### D.  Ineffective Assistance of Counsel[25]

The Petitioner blames Counsel for his plight, arguing that he did not provide effective assistance (Docket No. 1, pp. 7-8).  To prevail on an ineffective assistance of counsel claim, a defendant must establish by a preponderance of the evidence that: (1) "counsel's performance fell below an objective standard of reasonableness;" and (2) that this deficient performance resulted in actual prejudice.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  Judicial scrutiny of counsel's performance is highly deferential.  Id. at 689.  A court must indulge a strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance.  Id.  Prejudice requires a showing of a reasonable probability that, but for counsel's errors, the defendant "would not have pleaded guilty and would have insisted on going to trial."  Caramadre, 807 F.3d at 371.  The standard is highly demanding and places a "heavy burden" on the Petitioner.  Fernández-Santos v. U.S., 530 F.Supp.3d 208, 214 (D.P.R. 2021).  A reviewing court need not address both requirements under Strickland "if the evidence as to either is lacking."  Malone v. Clarke, 536 F.3d 54, 64 (1st Cir. 2008).

### 1.  Objective Standard of Reasonableness

When a defendant pleads guilty and later tries to withdraw his plea, "the ineffective assistance of counsel inquiry must focus on his lawyer's preparation, advice, and overall performance in counseling the defendant about whether to plead guilty."  Caramadre, 807 F.3d at 371.  In this instance, Counsel was prepared.  He had successfully represented the Petitioner before the First Circuit in the Original Case (Docket No. 47, pp. 57-58).  In that process, he studied the record and came to understand the issues and the evidence.  Id. at p. 58.  Similarly, he knew what the Petitioner was exposed to if found guilty.  Id. at pp. 62-63; TR, pp. 23-24.

---

[25] From this point on, the court refers to Attorney Hernández as "Counsel."

With that background, Counsel presented to the Petitioner- and the Petitioner approved -a negotiating strategy to limit by way of a type C agreement, Judge Besosa's discretion at sentencing (Docket No. 47, pp. 63-64).  He kept the Petitioner informed of the status of negotiations (Docket No. 49-1, pp. 2-3).  And as the sister court concluded in Pérez-Mercado, 2021 WL 666863 at *4, the resulting plea agreement was "extraordinarily favorable."  A lawyer's performance is deficient under Strickland only when "counsel's choice was so patently unreasonable that no competent attorney would have made it."  Tevlin v. Spencer, 621 F.3d 59, 66 (1st Cir. 2010).  Counsel's performance was not deficient, and certainly, not patently unreasonable.

The Petitioner complains that Counsel told him to plead guilty because Judge Besosa was an "SOB;" was prejudiced, angry and was going to give the Petitioner a life sentence (Docket No. 47, pp. 31, 34).  Moreover, he states that Counsel told him he could not go to trial and that the only option was to accept a plea agreement.  Id.  Counsel denied stating that the Judge was an "SOB;" that he was angry; or that the Petitioner's only option was to plead guilty.  Id., pp. 84-85.  The court gives credence to Counsel's version.  He reviewed options with the Petitioner and recommended a plea deal, clarifying that it was up to the Petitioner to decide, and that trial was always an option (Docket No. 47, p. 82; TR, p. 17).

As for reference to a life sentence, the allegation does not transform an otherwise effective assistance into an ineffective one.  The case of Ward v. Maine, 2014 WL 4980431 (D. Me. Oct. 6, 2014) illustrates the point.  In Ward, the defendant complained of ineffective assistance of counsel in connection with a state proceeding alleging, among other things, that counsel threatened that the defendant would receive life imprisonment if he did not accept an open plea of guilty.  Id. at *9. The District Court rejected the claim, noting that counsel's

"threat" was an accurate assessment of the defendant's situation.  Id.  So too here, where the Petitioner was at risk of being sentenced to life imprisonment as had occurred in the Original Case.  See, TR, pp. 19, 24.

The Petitioner alleges that Counsel did not: inform him of the Judge's comments which the Petitioner deems unlawful; advise him to withdraw his plea; or move to set it aside (Docket No. 1, pp. 7-8).  Quaere whether the comments crossed a line.  Counsel did not believe they were improper (Docket No. 47, pp. 70-71).  Regardless, the Petitioner was aware of the comments before he decided to enter into a plea agreement and plead guilty.  He participated in codefendants' meetings with record attorneys where the issue of the comments was raised.  TR, pp. 53-57.  He also was aware of Mr. Rosario's motions (Docket No. 47, pp. 50-51; TR, 36-37).  And he considered withdrawing his plea after he pled guilty (TR, 29-34, 42-43).

Counsel informed him that it was a decision for the Petitioner to make.  Id. at p. 30.  In this case, he had pled guilty under a type C plea agreement and Judge Besosa had not yet accepted the plea.  Id. at pp. 30-34.  The Petitioner discussed the matter extensively with Counsel, who recommended that the Petitioner not withdraw the plea.  Id. at pp. 31-32.  In the end, the Petitioner followed that advice and decided not to withdraw the plea.  Id. at pp. 32, 42-43.  He never instructed Counsel to file a motion to withdraw the plea.  Id. at 34.  A defendant cannot complain of counsel when the attorney, "employing his best professional judgment, recommends that the defendant plead guilty."  U.S. v. Buckles, 843 F.2d 469, 472 (11th Cir. 1988).[26]

---

[26] The Petitioner propounds that Counsel had him plead guilty for more narcotics (at least 5 kilograms but less than 50 kilograms of cocaine) than he was charged with (at least 5 kilograms of cocaine) (Docket No. 1-1, p. 3).  The stipulated amount of at least 15 kilograms but less than 50 kilograms of cocaine is comprised in the "5 kilograms or more" of cocaine that was charged in the Indictment and represents a significant reduction from the 345 kilograms

The Petitioner claims or suggests that Judge Besosa was not impartial (Docket No. 28, pp. 5, 10, 11, 13), and argues that Counsel should have sought Judge Besosa's recusal (Docket No. 1-1, pp. 7-8). Counsel did not believe that Judge Besosa was biased (Docket No. 47, pp. 63, 64). Into the bargain, a recusal motion would have been meritless, and no attorney is obligated "to file a meritless motion merely because his client demands it." U.S. v. Schofield, 2021 WL 50133, *4 (D.R.I. Jan. 4, 2021). To that point, Caramadre, 807 F.3d at 359 shows why the motion would have lacked merit. In that case, the defendant had pled guilty pursuant to a plea agreement after 4 days of trial and the First Circuit turned down his claim that the District Court exhibited bias in denying a motion to withdraw his guilty plea and should have recused himself. Id. at 364, 366, 374.

When the District Court learned that the defendant had dismissed his trial counsel, retained new counsel to represent him, and new counsel intended to file a motion to withdraw the defendant's plea of guilty, it conducted an in-chambers conference during which it initially inquired of counsel what would be the legal basis for the suggested motion. See, U.S. v. Caramadre, No. 11-186 (D.R.I. Jan. 2, 2015)(unpublished order)(Appendix I), pp. 1-2. Counsel responded that he was not yet sure of the basis. Id. at p. 2. In view of the equivocal response, the District Court made several observations to assist counsel and the defendant in considering whether such a motion was in fact justified and/or in defendant's best interest. Id. at 3.

---

he had been held accountable for (Crim. No. 08-310, Docket No. 3560, pp. 25-26). The Petitioner states that Counsel never informed him that he was accepting ting responsibility for those drugs (Docket No. 1-1, p. 3). The Petitioner admitted under oath that he was responsible for the drugs stipulated in the plea agreement (Crim. No. 08-310, Docket No. 4868, p. 19). In the plea agreement, the Petitioner represented to be satisfied with his counsel and that counsel rendered effective legal assistance. Id., Docket No. 4675, p. 5. In the change of plea hearing, he expressed that he was fully satisfied with his counsel and the representation and advice given to him by his attorney. Id., Docket No. 4868, p. 7. The Petitioner complains that Counsel abandoned him after the sentence (Docket No. 1, p. 8). Counsel explained that the Petitioner requested that he withdraw as attorney of record, which he did, after filing a notice of appeal as the Petitioner had instructed. See, TR, pp. 35-36. Counsel was not ineffective in any of these instances.

First, the District Court explained to counsel that the evidence had been quite compelling and that this may well have been what motivated the defendant, in consultation with his attorneys, to reach the conclusion that a plea was in his best interest.  See, Appendix I, p. 3.  The District Court pointed out that if the motion to withdraw the plea was successful, counsel would be in the position of defending the case against what appeared to be very compelling evidence. Id.  The District Court emphasized that he should review the evidence carefully in order to properly advise the defendant on whether a motion to withdraw the plea was advisable before filing his motion.  Id. at 3-4.

Second, the District Court made counsel aware of the risks associated with filing a motion to withdraw a plea that was unsubstantiated and unsuccessful, including that the defendant would be conceding that he had perjured himself in the plea hearing, which could lead to additional charges against him.  Id. at 4.  Even more, the District Court expressed that if the defendant was unsuccessful, his explanation of why he sought to withdraw his plea could work against him at the time of sentencing because it would be used by the government and potentially seen by the District Court as a withdrawal of his acceptance of responsibility.  Id.

Third, the District Court advised counsel of the serious consequences to the defendant of successfully withdrawing his plea and proceeding to trial, given the very high guideline range associated with the case (i.e. life imprisonment).  See, Id. at 4.  In the District Court's view, based on its understanding of the evidence complied by the government in the run-up trial, and presented during the first week of trial, the defendant faced a strong likelihood of being convicted at trial.  Id. at 4-5.  Thus, the District Court explained that if the motion to withdraw the plea was granted, and the defendant proceeded to trial, he stood a good chance of being

convicted and could be in a much more precarious position at sentencing than under the plea

agreement.  Id. at 5.

The defendant filed the motion to withdraw the guilty plea, which the District Court

denied.  U.S. v. Caramadre, 957 F.Supp.2d 160, 164-165 (D.R.I. 2013)(so noting).  The District

Court mentioned in Appendix I that the motion referenced phrases that the defendant contended

may have been used by the Court in expressing the views noted above.  Id. at pp. 5-6.  Those

phrases include that the first week of trial had been a "complete, unmitigated disaster" for the

defendant; had the trial continued, it would have been from the defendant's point of view, "a

train wreck for the next [3] months;" and that the defendant had changed his plea because "he

was getting killed at trial."  Caramadre, 807 F.3d at 375-376.[27]

Additionally, the defendant complained that the District Court: had characterized his

plea-withdrawal motion as "entirely meritless, bordering on the frivolous;" stated that the motion

was "an incredibly cynical and disturbing effort to manipulate the court and the criminal justice

system;" and suggested that the actions of the defendant's new counsel "might subject him to

disciplinary review."  Caramadre, 807 F.3d at 374.  The First Circuit held that those statements

were "insufficient to demonstrate" that the District Court harbored a disqualifying bias against

the defendant.  Id. at 377.  With this holding, a motion to disqualify Judge Besosa would have

been meritless, if not frivolous, and as mentioned earlier, no attorney has an obligation to file

meritless motions.  When there is no merit to an underlying issue, a petitioner "cannot establish

---

[27] The District Court pointed out that it was quite possible that it had used some or all of the terms mentioned in the motion but if such terms were used (and the Court did not specifically recall the exact words used in expressing what it had conveyed to counsel), it used those phrases and terms in order to emphasize the points covered during the Conference in such a way as to be helpful to counsel in deciding how to advise his client about how to proceed. See, Appendix I, p. 6.

deficient performance or prejudice arising from counsel's failure to further pursue the issue."

Posey, 2020 WL 2129235 at *8.

## 2.   **Prejudice**

The previous section suffices to dispose of the ineffective assistance of counsel claim.   But the record also shows lack prejudice.   Put simply, even if Counsel's representation fell below an objective standard of reasonableness- and that was not the case here -the Petitioner cannot show that there was a reasonable probability that for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.   The Petitioner was cognizant of the evidence and of potential exposure, and aware of Judge Besosa's comments before he pled guilty pursuant to what under the circumstances amounted to a favorable type C agreement.   During the change-of-plea hearing, the government stated on the record the evidence it would have presented at trial, and the Petitioner did not raise any issues with this evidence when presented with it. Furthermore, he stated under oath that he was guilty and expressed remorse to the Probation Officer.   He knew of Mr. Rosario-Camacho's motions before the sentencing date; and considered withdrawing the plea of guilty before that date but decided not to.   He cannot blame counsel's purported "errors" for the decision that he made.   As such, there is no prejudice under Strickland.

## III.   **CONCLUSION**

For the reasons stated, petitioner's motion under 28 U.S.C. § 2255 is DENIED and the case DISMISSED.   Judgment shall be entered accordingly.

## IV.   **CERTIFICATE OF APPEALABILITY**

Pursuant to Rule 11(a) of the "Rules Governing Section 2255 Proceedings for the United States District Courts," the District Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant.   The District Court may issue a

Maysonet-Soler v. U.S.
Civil No. 20-1202 (PAD)
Opinion and Order
Page 44

COA upon "a substantial showing of the denial of a constitutional right."   28 U.S.C. §

2253(c)(2).  Because no such showing has been made in the present case, the court will not issue

a COA.  Petitioner may still seek a certificate directly from the First Circuit under Rule 22 of the

Federal Rules of Appellate Procedure.

        **SO ORDERED.**

    In San Juan, Puerto Rico, this 12th day of April, 2024.

                                        s/Pedro A. Delgado Hernández
                                        PEDRO A. DELGADO HERNÁNDEZ
                                        United States District Judge